Elizabeth J. Cabraser (CA Bar No. 083151)
ecabraser@lchb.com
Eric B. Fastiff (CA Bar No. 182260)
efastiff@lchb.com
Bruce W. Leppla (CA Bar No. 071642)
bleppla@lchb.com
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, Ca  94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*(Additional Counsel Listed on Signature Page)*

*Attorneys for Plaintiff District
Council 37 Benefits Fund Trust*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| DISTRICT COUNCIL 37 BENEFITS FUND TRUST, individually and on behalf of all those similarly situated,<br><br>                        Plaintiff,<br><br>vs.<br><br>McKINSEY & COMPANY, INC.,<br><br>                        Defendant. | Case No. 3:21-cv-6274<br>Lead Case No. 3:21-md-02996-CRB (SK)<br><br>**COMPLAINT FOR VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, *ET SEQ.*, FRAUD BY CONCEALMENT, AND UNJUST ENRICHMENT**<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION** |

1

## TABLE OF CONTENTS

2
**Page**

3    I.      INTRODUCTION ................................................................................................ 1

4    II.     JURISDICTION AND VENUE ......................................................................... 2

     III.    PARTIES ........................................................................................................... 2

5            A.      Plaintiff DC 37 ..................................................................................... 2

6            B.      Defendant McKinsey ............................................................................ 3

7    IV.     CONTINUING VIOLATIONS ......................................................................... 3

     V.      CLASS ACTION ALLEGATIONS .................................................................. 3

8    VI.     FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS ......................... 7

9            A.      The Corporate Integrity Agreement ..................................................... 7

10           B.      McKinsey's Role Following the Corporate Integrity Agreement ......... 8

                     1.      The Sacklers seek to divert money to themselves ..................... 8

11                   2.      McKinsey supplied Purdue with Granular Sales and Marketing
                             Strategies and Remained Intimately Involved in Implementation ............ 9
12
             C.      Project Turbocharge ........................................................................... 10

13           D.      McKinsey Knew About Dangers of Opioids and Acted to Maximize
                     OxyContin Prescriptions Anyway ...................................................... 12
14
             E.      Purdue's 2020 Guilty Plea and McKinsey's Recent Statement ......... 12

15           F.      Tolling of Statutes of Limitations ...................................................... 14

16                   1.      Equitable Estoppel and Fraudulent Concealment ................... 14

17                   2.      McKinsey and Purdue Persisted in The Fraudulent Scheme Despite
                             a Guilty Plea and Large Fine ................................................... 15
18   VII.    FACTUAL ALLEGATIONS PERTAINING TO CLAIMS UNDER THE
             RACKETTER-INFLUENCED AND CURRPOT ORGANIZATIONS (RICO)
19           ACT: THE OPIOID MARKETING ENTERPRISE ........................................ 16

20           A.      The Common Purpose and Scheme of the Opioid Marketing Enterprise ........... 16

             B.      The Conduct of the Opioid Marketing Enterprise Violated Civil RICO ............ 18

21           C.      Pattern of Racketeering Activity ........................................................ 19

22   VIII.   CAUSES OF ACTION ..................................................................................... 23

23           A.      Racketeer Influenced and Corrupt Organizations (RICO), 18 U.S.C. §
                     1961, et. seq. ...................................................................................... 23
24
             B.      Fraud by Concealment ........................................................................ 31

25           C.      Unjust Enrichment ............................................................................. 32

     IX.     PRAYER FOR RELIEF .................................................................................... 33

26   X.      JURY DEMAND ............................................................................................. 34

27

28

## I. **INTRODUCTION**

Plaintiff, DISTRICT COUNCIL 37 BENEFITS FUND TRUST ("DC 37"), on behalf of itself and all others similarly situated, brings this Class Action Complaint against Defendant McKinsey & Company, Inc.  At all relevant times, Plaintiff has paid and/or provided reimbursement for some or the entire purchase price on behalf of its members and reitrees for prescription opioids during the Class Period. Plaintiff has sustained injury as a result of Defendants' illegal and wrongful conduct alleged herein. Based upon personal knowledge, information, belief, and investigation of counsel, DC 37 specifically alleges:

1. This case arises from the worst man-made epidemic in modern medical history—the misuse, abuse, and over-prescription of opioids. This crisis arose from the opioid manufacturers' deliberately deceptive marketing strategy to expand opioid use.

2. McKinsey and Company, Inc. ("McKinsey" or "Defendant") played an integral role in creating and deepening the opioid crisis.

3. In the years following Purdue Pharma L.P.'s ("Purdue") 2007 guilty plea for misleadingly marketing OxyContin, McKinsey worked closely with Purdue to dramatically increase OxyContin sales to the benefit of McKinsey, Purdue, and the Sackler family, the wealthy family that has owned and controlled Purdue for decades. McKinsey specifically sought to maximize OxyContin sales by working around the requirements of the Corporate Integrity Agreement that Purdue entered as part of its guilty plea. McKinsey also performed related work for other manufacturers of opioids, including Johnson & Johnson. Through the conduct described in this Complaint, McKinsey participated in and helped orchestrate a broad scheme to deceptively market opioids.

4. McKinsey knew of the dangers of opioids and of Purdue's prior misconduct, but nonetheless advised Purdue to improperly market and sell OxyContin, supplying granular sales and marketing strategies and remaining intimately involved throughout implementation of those strategies. McKinsey's actions resulted in a surge in sales of OxyContin and other opioids that fueled and prolonged the opioid crisis.

5.      As reported in the media, in a series of agreements, McKinsey recently settled opioid-related claims with 49 states, the District of Columbia, and five U.S. territories.

**II.      JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction over this action because DC 37 brings a federal cause of action that raises a federal question pursuant to 28 U.S.C. § 1331.

7.      This Court has personal jurisdiction over McKinsey because at all relevant times, McKinsey purposely availed itself of the privilege of doing business in the State of California and in this District, including by engaging in the business of researching, designing, and implementing marketing and promoting strategies for various opioid manufacturers, including Purdue, in support of their sales and marketing of opioids in Ohio.

8.      Venue is proper in the United States District Court for the Northern District of California under 28 U.S.C. § 1391(g) and 18 U.S.C. § 1965.

**III.      PARTIES**

**A.      Plaintiff DC 37**

9.      District Council 37 Benefits Fund Trust ("DC 37") is a non-profit health, self-funded welfare benefit plan that funds prescription drugs to its covered public sector employees, retiree,s and their families through its subordinate trust, District Council 37 Health & Security Plan Trust, which administers DC 37's prescription drug plan. When the term Member or Members is used throughout this Complaint, it should be construed to include retirees and as well as dependents of active and retiree participants covered by the prescription drug plan. Its principal place of business is in New York, New York at 55 Water Street, 22nd Floor. DC 37 is New York City's largest public employee union. DC 37's health and welfare benefit plan covers approximately 150,000 active union members as well as over 50,000 retirees and their families—totaling over 300,000 lives. DC 37 includes 51 local unions, representing public sector employees serving in thousands of job titles from Accountants to Zoo Keepers. Members covered by DC 37's benefit plan work in almost every agency in New York City including but not limited to the City's police and fire departments, hospitals, schools, libraries, social service centers, water treatment facilities, and city colleges. DC 37 provides supplemental health benefits, including a

prescription drug benefit to its members, retirees, and their families. Throughout the Class Period and throughout the United States, DC 37 indirectly purchased, paid, and reimbursed for opioids intended for consumption by its members, retirees, and their families and for substance abuse treatment. Given its plan members' past purchases of opioids, DC 37 anticipates that it will continue to purchase and/or provide reimbursement for opioids and for substance abuse treatment in the future.

**B.    Defendant McKinsey**

10.    Defendant McKinsey and Company, Inc. is a corporation organized under the laws of the State of New York. McKinsey's principal place of business is located at 711 Third Avenue, New York, NY 10017.

11.    McKinsey is a worldwide management consultant company. From approximately 2004-2019, McKinsey provided consulting services to Purdue Pharma L.P., working to maximize sales of OxyContin and knowingly perpetuating the opioid crisis. McKinsey has provided related consulting services to other manufacturers of opioids.

**IV.    CONTINUING VIOLATIONS**

12.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, DC 37 and the members of the Class can recover for damages that they suffered during any applicable limitations period.

**V.    CLASS ACTION ALLEGATIONS**

13.    DC 37, on behalf of itself and all other similarly situated purchasers, seeks damages, trebled where available under applicable law, against Defendant based on allegations of the creation of a conspiracy and conduct of an illegal enterprise to expand the market for opioids.

14.    This is a quintessential class action. The most significant questions of law and fact on which Defendant's liability to the Class turns are common ones, because the knowledge, conduct and duty of Defendant, and whether that duty was breached to the economic detriment of those who paid for the resulting avalanche of opioids, does not depend on the individual characteristics of the Class members, but on conduct directed by Defendant to patients and health

care providers at large. Defendant saw an opportunity to make enormous profits by creating a

market for opioids, and saturating that market with knowledge of, but without regard for, the

economic consequences to anyone but itself and its Opioid clients.

15.     DC 37 brings this action on behalf of itself and as a class action under Federal

Rules of Civil Procedure 23(a), (b)(2), and (b)(3), seeking actual and treble damages, as well as

equitable and injunctive relief, on behalf of a Class of purchasers (the "Class") defined as

follows:

> All health insurance companies, third-party administrators, health maintenance
> organizations, self-funded health and welfare benefit plans, third-party payors and
> any other health benefit providers, in the United States of America and its
> territories, who have, from the inception of Opioid Marketing Enterprise
> Members' course of allegedly RICO- violative conduct as alleged herein, through
> a date to be established by the Court (such as the date of approval of class notice),
> paid or incurred costs for prescription opioids manufactured, marketed, sold, or
> distributed by the Opioid Marketing Enterprise Members, for purposes other than
> resale, and/or paid or incurred costs for treatment related to the misuse, addiction,
> and/or overdose of opioid drugs.

> This class excludes: (a) Defendant and its subsidiaries, affiliates, and controlled
> persons; (b) Defendant's officers, directors, agents, servants, or employees, and the
> immediate family members of any such person; (c) all persons who and entities
> that make a timely election to be excluded from the proposed Class; (d) all federal
> and state government entities except for cities, towns, municipalities, or counties
> with self-funded prescription drug plans; (e) pharmacy benefit managers; (f) any
> Opioid manufacturers, distributors, and retailers named in actions pending in MDL
> No. 2804 (N.D. Ohio); and (g) any judges or justices involved in this action and
> any members of their immediate families.

16.     While DC 37 does not know the exact number of the members of the Class, DC 37

believes there are thousands of members in the Class. The Class members are so numerous and

dispersed throughout the United States that joinder of all members is impracticable. The Class is

composed of thousands of third-party payors, and the disposition of their claims in a Class action

will benefit both the parties and the Court. Defendants sell millions of doses of opioids in the

United States every year, and thus the Class is sufficiently numerous to make joinder

impracticable. The Class members can be identified by, inter alia, records maintained by

Defendants, pharmacies and pharmacy benefit managers ("PBMs").

17.     Common questions of law and fact exist as to all members of the Class. This is

particularly true given the nature of Defendant's schemes, which were spread across the country

and directed at all Class members, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

a.      Whether Defendant misrepresented the safety and efficacy of opioids, to the financial detriment of the Class;

b.      Whether Defendant engaged in a conspiracy or conspiracies to promote the sales of opioids;

c.      Whether Defendant engaged in a conspiracy or conspiracies to suppress adverse information about opioids;

d.      Whether Defendant substantially caused or contributed to the opioid epidemic;

e.      Whether Defendant's conduct in creating, proposing, and implementing sales and marketing strategies for opioids manufactured by Purdue before and after Purdue's first guilty plea in 2007 relating to misbranding of OxyContin contributed to the Class's injuries;

f.      Whether Defendant performed reasonable due diligence in ascertaining the risks associated with its strategies for "turbocharging" OxyContin sales at Purdue in 2013 and thereafter;

g.      Whether Defendant's implementation of sales and marketing strategies at its clients caused or contributed to an increase in opioid addiction;

h.      Whether, developing plans for its clients to market and sell opioids, Defendant failed to disclose the dangers and risks to the health of persons ingesting the drug;

i.      Whether Defendant conspired with its clients to misrepresent in their advertisements, promotional materials and other materials, among other things, the safety, potential side effects, and convenience of opioids;

j.      Whether Defendant knowingly omitted, suppressed and/or concealed material facts about the unsafe and defective nature of opioids from government regulators;

k.      Whether Defendant engaged in conduct that violates federal RICO statutes in promoting the sales of and suppressing adverse information about opioids;

l.      Whether Defendant engaged in a conspiracy to promote the sales of and suppress adverse information about Opioids in violation of federal RICO statutes;

1      m.      Whether Defendant engaged in a pattern of deceptive, fraudulent and/or

2  improper activity;

3          n.      Whether Defendant engaged in the conduct alleged herein;

4          o.      Whether Defendant and the other RICO Marketing Enterprise Members

5  formed the Opioid Marketing Enterprise for the purpose of effectuating their fraudulent schemes;

6          p.      Whether the Opioid Marketing Enterprise Members used the U.S. mails

7  and interstate wire facilities to carry out their fraudulent scheme;

8          q.      Whether the Opioid Marketing Enterprise Members engaged in a pattern of

9  racketeering;

10          r.      Whether Defendant's conduct, in whole or in part, has substantially

11  affected interstate and intrastate commerce;

12          s.      Whether Defendant unjustly enriched itself to the detriment of DC 37 and

13  the members of the Class;

14          t.      Whether the conduct of Defendant, as alleged in this Complaint, caused

15  injury to the business or property of DC 37 and the members of the Class, and if so, the

16  appropriate class-wide measure of damages;

17          u.      Whether Plaintiff and the Class paid for more opioids than for other

18  efficacious drugs that were available at cheaper prices, and/or paid for more opioids due to

19  addiction, and/or paid for treatment including drug addiction treatment, and emergency medical

20  care including the costs of opioid overdose reversal drugs, such as Naloxone Hydrochloride

21  (Narcan), as a result of the abuse, misuse, addiction and/or overdose of opioids;

22          v.      Whether the Class has been damaged, and if so, the extent of such damages

23  and/or the nature of the equitable relief, statutory damages, or punitive damages to which the

24  Class is entitled; and

25          w.      The amount of attorneys' fees, prejudgment interest, and costs of the suit to

26  which the Class is entitled.

27      18.      The questions of law and fact common to the members of the Class predominate

28  over any questions affecting only individual members.  The foregoing common questions of law

and fact are also of significant significance, alone or in combination, to warrant class treatment under Rule 23(c)(4).

19.     DC 37's claims are typical of the claims of Class members. DC 37 and all members of the Class are similarly affected by Defendant's wrongful conduct in that they sustained damages arising out of the Defendant's wrongful conduct as detailed herein. Specifically, Plaintiff expended substantial sums for the purchase of opioids and treatment for their abuse. DC 37's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.

20.     DC 37 will fairly and adequately protect the interests of the Class. DC 37 is a member of the Class, and DC 37's interests are coincident with, and not antagonistic to, those of the other members of the Class. DC 37 is represented by counsel who are competent and experienced in the prosecution of class action litigation.

21.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

22.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VI.     FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.     The Corporate Integrity Agreement

23.     In May of 2007, Purdue Frederick Company, the parent company of Purdue Pharma L.P. ("Purdue"), pleaded guilty to charges for misleading regulators, doctors, and the

public regarding Purdue's opioid OxyContin. In pleading guilty, Purdue admitted to falsely

marketing OxyContin as a less addictive, safer alternative to other pain medications.

24.     In the global settlement resolution, Purdue and its parent company paid over $600

million and entered into a Corporate Integrity Agreement with the U.S. Department of Health and

Human Services Office of Inspector General.

25.     Under the Corporate Integrity Agreement, for five years, Purdue was required to

refrain from making any deceptive or misleading claims about OxyContin and was obligated to

submit regular compliance reports regarding its sales and marketing practices. Purdue was also

required to monitor, report, and attempt to prevent inappropriate prescribing practices.

**B.      McKinsey's Role Following the Corporate Integrity Agreement**

**1.      The Sacklers seek to divert money to themselves.**

26.     The Sackler family is among the richest families in the United States. Members of

the Sackler family have controlled Purdue at all times relevant to this Complaint.

27.     Following the guilty plea, the Sacklers sought to insulate themselves from the risk

they perceived in Purdue. Email threads between the Sacklers in early 2008 indicate that the

Sacklers had become concerned about personal liability regarding opioid-related misconduct.

28.     The Sacklers considered selling Purdue or merging with another pharmaceutical

company as an option for limiting their risk. Mortimer Sackler Jr. advocated for a sale or merger

in a February 21, 2008 email to Dr. Richard Sackler (a former president and co-chairman of

Purdue) and several others, writing "[t]he pharmaceutical industry has become far too volatile and

risky for a family to hold 95% of its wealth in. It simply is not prudent for us to stay in the

business given the future risks we are sure to face and the impact they will have on the

shareholder value of the business and hence the family's wealth." The risk he referred to was, at

least in significant part, further liability related to misconduct in the marketing and sale of

OxyContin.

29.     Alternatively, the Sacklers considered extracting as much wealth as possible from

Purdue through distributions to themselves as shareholders. Such distributions would allow the

Sacklers to diversify their assets and make their wealth less vulnerable to judgments regarding Purdue's sales and marketing of opioids, including OxyContin.

30. Either option -- a sale or significant distributions to shareholders -- would require Purdue to increase profitability in the short term. Purdue turned to McKinsey, with which it had an existing business relationship, for help maximizing sales of OxyContin given the requirements of the Corporate Integrity Agreement and the scrutiny that came along with it.

**2. McKinsey supplied Purdue with Granular Sales and Marketing Strategies and Remained Intimately Involved in Implementation**

31. McKinsey touts its model of engaging in transformational partnerships with its clients. Rather than giving one-off advice, McKinsey learns each client's business intimately and provides tailored, granular strategies.

32. McKinsey had begun collaborating with Purdue by June 2009. McKinsey was tasked with increasing OxyContin sales despite the Corporate Integrity Agreement, which required, among other things, that Purdue comport with FDA requirements and also included increased review and reporting obligations.

33. McKinsey provided sales and marketing strategies designed to sell as much OxyContin as possible, at one point in 2010 telling Purdue that the new strategies McKinsey had developed could generate as much as $400,000,000 in additional annual sales. McKinsey worked with Purdue to implement the strategies, with McKinsey's ongoing and extensive involvement.

34. OxyContin sales grew dramatically, and the Sacklers diverted the resulting profits into other holdings.

35. In a 2009 report, among other sales strategies, McKinsey advised Purdue sales representatives to push the highest dosages of OxyContin, which were the most profitable for Purdue. In order to maximize dosages and improve targeting of the coordinated marketing strategy, McKinsey investigated the prescribing habits of individual physicians.

36. McKinsey helped shape Purdue's OxyContin marketing, which misleadingly centered on freedom and peace of mind for users. The marketing was tailored to avoid running directly afoul of the Corporate Integrity Agreement, but it remained misleading given what

Purdue and McKinsey knew about opioids. One advertisement said, "We sell hope in a bottle," despite the fact that both McKinsey and Purdue already understood the addiction problems associated with opioid use and abuse.  McKinsey encouraged Purdue to tell doctors that OxyContin would give their patients "the best possible chance to live a full and active life."

37.    McKinsey urged Purdue to train and incentivize its sales representatives to increase sales across the market for opioids, even if sales went to Purdue's competitors. This was intended to serve the Sackler family's goal of increasing the marketability of Purdue for potential mergers, but it had the effect of worsening the opioid crisis even beyond the portion of the crisis directly attributable to sales and use of OxyContin.

**C.    Project Turbocharge**

38.    The Corporate Integrity Agreement expired in 2012.  With this restriction lifted, McKinsey devised additional marketing and sales strategies for Purdue to further increase OxyContin sales.

39.    In the second half of 2013, McKinsey made recommendations to Purdue to increase OxyContin revenue, including "Turbocharging Purdue's Sales Engine."

40.    McKinsey's "Project Turbocharge" recommendations included revising the existing process for targeting high-prescribing physicians, with a shift from targeting solely on the basis of prescription deciles to considering additional factors. Based on its analysis, McKinsey told Purdue that "[t]here is significant opportunity to slow the decline of OxyContin by calling on more high-value physicians" and that "[t]he revenue upside from sales re-targeting and adherence could be up to $250 million."

41.    Also as part of the "Project Turbocharge" recommendations, McKinsey determined and advised Purdue that the top half of prescribing physicians "write on average 25 times more scripts per prescriber" than the lower half.

42.    Despite knowing that then-recently-expired Corporate Integrity Agreement required Purdue to refrain from improperly incentivizing OxyContin sales, McKinsey also recommended increasing incentive compensation for incremental OxyContin prescriptions,

advising Purdue that "[r]evision to incentive comp could better align reps to Purdue's economics."

43.     At the same time, McKinsey recommended decreasing training by six days a year in order to allow employees more time to make sales calls. Meanwhile, McKinsey advised Purdue to exercise closer control over its sales staff in order to generate more efficient physician targeting.

44.     Physician targeting proved effective. McKinsey advised Purdue that visiting high-prescribing doctors many times per year increased sales.

45.     McKinsey recommended that Purdue circumvent pharmacies entirely with a mail order program because enforcement by federal regulators was decreasing OxyContin dispensing through Walgreens.

46.     At the board level, McKinsey urged the Sacklers to impose a "revenue growth goal" on management.

47.     With McKinsey's ongoing involvement and advice, Purdue implemented McKinsey's recommendations discussed above, but rebranded the program from Project Turbocharge to Evolve to Excellence.

48.     McKinsey's efforts had the effect the Sacklers had asked McKinsey to achieve. Sales of OxyContin tripled in the years following the 2007 guilty plea, despite the restrictions imposed by the Corporate Integrity Agreement. According to the U.S. Department of Justice, "[f]rom 2010 to 2018, Purdue's profits were almost entirely driven by its success in selling OxyContin."

49.     The Sacklers did not sell Purdue or enter into a merger, but their goal of extracting wealth from the business was realized. The Sackler family has withdrawn over $10 billion from Purdue since 2008, including $1.7 billion in 2009 alone. These distributions were made possible by McKinsey's services and came at the expense of a deepening national opioid crisis.

**D.**    **McKinsey Knew About Dangers of Opioids and Acted to Maximize OxyContin Prescriptions Anyway**

50.    McKinsey has a long history of consulting in the pharmaceutical industry. In addition to its work with Purdue, McKinsey has performed "opioid-related work" for Johnson & Johnson, Endo International, and Mallinckrodt Pharmaceuticals. For instance, a McKinsey PowerPoint presentation prepared for Johnson & Johnson recommended that Johnson & Johnson aggressively target and influence doctors treating back pain in order to increase opioid sales.

51.    Purdue's 2007 guilty plea put McKinsey on notice of Purdue's misconduct. By that time, McKinsey had access to public information indicating that OxyContin and other opioids pose significant risk of addiction and misuse.

52.    McKinsey's presentations to Purdue in 2013 included extensive discussion of doctors' concerns about opioid misuse and side effects, demonstrating McKinsey's awareness of the dangers of opioids. Rather than working to limit these disastrous effects, McKinsey treated doctors' misgivings as obstacles to confront with new messaging.

53.    McKinsey continued working with Purdue long after the severity of the opioid crisis was well known. In 2017, McKinsey proposed that Purdue pay CVS and other distributors of OxyContin rebates "for every OxyContin overdose attributable to pills they sold."

54.    A former McKinsey consultant described McKinsey's work with Purdue as "the banality of evil, M.B.A. edition. . . . They knew what was going on. And they found a way to look past it, through it, around it, so as to answer the only questions they cared about: how to make the client money, and when the walls closed in, how to protect themselves."

55.    In a 2018 email thread, apparently fearing consequences for McKinsey's work with Purdue, two McKinsey senior partners who had participated in McKinsey's work advising Purdue discussed deleting documents related to opioids.

**E.**    **Purdue's 2020 Guilty Plea and McKinsey's Recent Statement**

56.    In October of 2020, Purdue once again reached an agreement (the "2020 Settlement Agreement") with the U.S. Department of Justice to enter a guilty plea related to its

marketing of OxyContin. The agreement includes $8.3 billion in penalties from Purdue and $225 million from the Sackler family.

57.     In the 2020 Settlement Agreement, Purdue pleaded guilty to defrauding health agencies, violating anti-kickback laws, paying illegal kickbacks to doctors, and "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids--frivolous prescriptions that experts say helped fuel a drug addiction crisis that has ravaged America for decades."

58.     The 2020 Settlement Agreement was entered by Purdue and the United States government. It explicitly states that it does not release Purdue of "[a]ny liability for claims of the states or Indian tribes."

59.     The 2020 Settlement Agreement includes a provision specifically reserving claims regarding "[a]ny liability of entities other than the [Purdue Bankruptcy] Debtors, including consultants."

60.     On December 5, 2020, McKinsey issued the following statement regarding its work with Purdue:

> *December 5, 2020*—As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the epidemic unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year we stopped doing any work on opioid-specific business, anywhere in the world.
>
> Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work sought to increase overdoses or misuse and worsen a public health crisis is wrong. That said, we recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.
>
> We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential deletion of documents. We continue to cooperate fully with the authorities investigating these matters.

61.     In recent weeks, McKinsey has settled opioid-related claims with 49 states, the District of Columbia, and five U.S. territories.

**F.    Tolling of Statutes of Limitations**

     **1.    Equitable Estoppel and Fraudulent Concealment**

62.    McKinsey is equitably estopped from relying upon a statute of limitations defense because, alongside Purdue, McKinsey undertook active efforts to deceive DC 37 and to purposefully conceal their unlawful conduct and fraudulently assure the public and DC 37 that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer or distributor status in the State and to continue generating profits.  Notwithstanding the allegations set forth above, McKinsey and Purdue affirmatively assured the public and DC 37 that they were working to curb the opioid epidemic.

63.    McKinsey and Purdue were deliberate in taking steps to conceal their conspiratorial behavior and active role in the deceptive marketing and the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

64.    McKinsey's consulting services were given confidentially, and both McKinsey and Purdue concealed the content of those services from the public.

65.    McKinsey and Purdue also concealed from DC 37 the existence of DC 37's claims by hiding their lack of cooperation with law enforcement and affirmatively seeking to convince the public that Purdue's legal duties to report suspicious sales had been satisfied through public assurances that they were working to curb the opioid epidemic. They publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises to change their ways insisting they were good corporate citizens.  These repeated misrepresentations misled regulators, prescribers and the public, including DC 37, and deprived DC 37 of actual or implied knowledge of facts sufficient to put DC 37 on notice of potential claims.

66.    DC 37 did not discover the nature, scope and magnitude of McKinsey's misconduct, and its full impact on DC 37, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

67.     Purdue and McKinsey's campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing on DC 37 deceived the medical community, consumers, and DC 37.

68.     Further, Purdue and other opioid manufacturers also concealed and prevented discovery of information, including data from the ARCOS database.

69.     McKinsey intended that its actions and omissions made with Purdue would be relied upon, including by DC 37.  DC 37 did not know and did not have the means to know the truth, due to McKinsey's and Purdue's actions and omissions.

70.     DC 37 reasonably relied on McKinsey's and Purdue's affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

### 2.     McKinsey and Purdue Persisted in The Fraudulent Scheme Despite a Guilty Plea and Large Fine

71.     In May 2007, Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors about the risk of addiction.  Purdue was ordered to pay $600 million in fines and fees.  In its plea, Purdue admitted that its promotion of OxyContin was misleading and inaccurate, misrepresented the risk of addiction and was unsupported by science.  Additionally, Michael Friedman, the company's president, pled guilty to a misbranding charge and agreed to pay $19 million in fines; Howard R. Udell, Purdue's top lawyer, also pled guilty and agreed to pay $8 million in fines; and Paul D. Goldenheim, its former medical director, pled guilty as well and agreed to pay $7.5 million in fines.

72.     Nevertheless, even after the settlement, Purdue continued to pay doctors on speakers' bureaus to promote the liberal prescribing of OxyContin for chronic pain and fund seemingly neutral organizations to disseminate the message that opioids were non-addictive as well as other misrepresentations.  At least until early 2018, Purdue continued to deceptively market the benefits of opioids for chronic pain while diminishing the associated dangers of addiction.  After Purdue made its guilty plea in 2007, it assembled an army of lobbyists to fight any legislative actions that might encroach on its business.  Between 2006 and 2015, Purdue and

1   other painkiller producers, along with their associated nonprofits, spent nearly $900 million

2   dollars on lobbying and political contributions— eight times what the gun lobby spent during that

3   period. McKinsey participated extensively in these actions and provided Purdue with strategies

4   and assistance to maximize sales as described in this Complaint.

5       73.    As all of the government actions against the Purdue and McKinsey demonstrate,

6   McKinsey knew that the actions it took with Purdue were unlawful, and yet deliberately

7   proceeded in order to increase Purdue's sales and profits, and in turn to serve McKinsey's

8   financial interests.

9   **VII.    FACTUAL ALLEGATIONS PERTAINING TO CLAIMS UNDER THE**
    **RACKETTER-INFLUENCED AND CURRPOT ORGANIZATIONS (RICO) ACT:**
10  **THE OPIOID MARKETING ENTERPRISE**

11      **A.    The Common Purpose and Scheme of the Opioid Marketing Enterprise**

12      74.    Knowing that their products were highly addictive, ineffective and unsafe for the

13  treatment of long-term chronic pain, non-acute and non-cancer pain, McKinsey, which

14  participated in the marketing and sale of opioids as described in this Complaint, and

15  manufacturers of opioids, including Purdue, Johnson & Johnson, Cephalon, Janssen, Endo, and

16  Mallinckrodt (collectively, including McKinsey, the "Opioid Marketing Enterprise Members")

17  formed an association-in-fact enterprise and engaged in a scheme to unlawfully increase their

18  profits and sales, and grow their share of the prescription painkiller market, through repeated and

19  systematic misrepresentations about the safety and efficacy of opioids for treating long-term

20  chronic pain.

21      75.    In order to unlawfully increase the demand for opioids, the Opioid Marketing

22  Enterprise Members formed an association-in-fact enterprise (the "Opioid Marketing

23  Enterprise"). Through their personal relationships, the members of the Opioid Marketing

24  Enterprise had the opportunity to form and take actions in furtherance of the Opioid Marketing

25  Enterprise's common purpose. The Opioid Marketing Enterprise Members' substantial financial

26  contribution to the Opioid Marketing Enterprise, and the advancement of opioids-friendly

27  messaging, fueled the U.S. opioids epidemic.

28

76.     The Opioid Marketing Enterprise Members, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and the public, including DC 37, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use.  The misleading statements included: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition the Opioid Marketing Enterprise Members named "pseudoaddiction"; (4) that withdrawal is easily managed; (5) that increased dosing presents no significant risks; (6) that long-term use of opioids improves function; (7) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; (9) that abuse-deterrent formulations provide a solution to opioid abuse; and (10) that opioids would bring patients freedom and peace of mind.

77.     The scheme devised, implemented and conducted by the Opioid Marketing Enterprise Members was a common course of conduct designed to ensure that the Opioid Marketing Enterprise Members unlawfully increased their sales and profits through concealment and misrepresentations about the addictive nature and effective use of the Opioid Marketing Enterprise Members' drugs.  The Opioid Marketing Enterprise Members acted together for a common purpose and perpetuated the Opioid Marketing Enterprise's scheme, including through the unbranded promotion and marketing network as described above.

78.     There was regular communication between the Opioid Marketing Enterprise Members in which information was shared, misrepresentations were coordinated, and payments were exchanged. The Opioid Marketing Enterprise Members functioned as a continuing unit for the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

79.     As public scrutiny and media coverage focused on how opioids ravaged communities in throughout the United States, McKinsey did not challenge Purdue or other manufacturers' misrepresentations, seek to correct their previous misrepresentations, terminate

their role in the Opioid Marketing Enterprise, nor disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence. Instead, McKinsey continued to participate in the Opioid Marketing Enterprise for financial gain.

80.     The Opioid Marketing Enterprise Members engaged in certain discrete categories of activities in furtherance of the common purpose of the Opioid Marketing Enterprise. The Opioid Marketing Enterprise's conduct in furtherance of the common purpose of the Opioid Marketing Enterprise involved misrepresentations regarding the risk of addiction and safe use of prescription opioids for long-term chronic pain.

81.     The impact of the Opioid Marketing Enterprise's scheme is still in place—i.e., the opioids continue to be prescribed and used for chronic pain throughout DC 37's service area, and the epidemic continues to injure DC 37 and its service population and to consume DC 37's resources.

82.     As a result, it is clear that the Opioid Marketing Enterprise Members, including McKinsey, were each willing participants in the Opioid Marketing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose.

**B.      The Conduct of the Opioid Marketing Enterprise Violated Civil RICO**

83.     From at least 2004 to the present, each of the Opioid Marketing Enterprise Members exerted control over the Opioid Marketing Enterprise and participated in the operation or management of the affairs of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

a.      Creating and providing a body of deceptive, misleading and unsupported medical and popular literature about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

b.      Creating and providing a body of deceptive, misleading and unsupported electronic and print advertisements about opioids that (i) understated the risks and overstated the

benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

       c.       Creating and providing a body of deceptive, misleading and unsupported sales and promotional training materials about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

       d.       Devised and implemented marketing schemes that included targeting and misleading physicians, unlawfully incentivizing sales representatives to maximize prescriptions and dosages, and evading regulatory constraints.

       e.       Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications; and

       f.       Using front groups and key opinion leaders ("KOLs") to mislead the public about opioids.

84.    The scheme devised and implemented by the Opioid Marketing Enterprise Members amounted to a common course of conduct intended to increase the Opioid Marketing Enterprise Members' sales from prescription opioids by encouraging the prescribing and use of opioids for long-term chronic pain.  The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

**C.**      **Pattern of Racketeering Activity**

85.    The Opioid Marketing Enterprise Members' scheme described herein was perpetrated, in part, through multiple acts of mail fraud and wire fraud, constituting a pattern of racketeering activity as described herein.

86.    The pattern of racketeering activity used by the Opioid Marketing Enterprise Members and the Opioid Marketing Enterprise likely involved thousands of separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Opioid Marketing Enterprise, including essentially uniform misrepresentations, concealments and material omissions regarding the beneficial uses and non-addictive qualities for the long-term

treatment of chronic, non-acute and non-cancer pain, with the goal of profiting from increased sales of the Opioid Marketing Enterprise Members' drugs induced by consumers, prescribers, regulators and DC 37's reliance on the Opioid Marketing Enterprise Members' misrepresentations.

87. Each of these fraudulent mailings and interstate wire transmissions constitutes racketeering activity and collectively, these violations constitute a pattern of racketeering activity, through which the Opioid Marketing Enterprise Members defrauded and intended to defraud DC 37, and other intended victims.

88. The Opioid Marketing Enterprise Members devised and knowingly carried out an illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive and effective use of opioids for long-term chronic, non-acute and non-cancer pain. The Opioid Marketing Enterprise Members and members of the Opioid Marketing Enterprise knew that these representations violated the FDA approved use these drugs, and were not supported by actual evidence. The Opioid Marketing Enterprise Members intended that their common purpose and scheme to defraud would, and did, use the U.S. Mail and interstate wire facilities, intentionally and knowingly with the specific intent to advance, and for the purpose of executing, their illegal scheme.

89. By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain, to, prescribers, regulators and the public, including DC 37, the Opioid Marketing Enterprise Members engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

90. The Opioid Marketing Enterprise Members' use of the U.S. Mail and interstate wire facilities to perpetrate the opioids marketing scheme involved thousands of communications, publications, representations, statements, electronic transmissions, payments, including, inter alia:

a. Marketing materials about opioids, and their risks and benefits, which the Opioid Marketing Enterprise Members sent to health care providers, transmitted through the

1    internet and television, published, and transmitted to front groups, KOLs located across the

2    country, and DC 37;

3              b.        Written representations and telephone calls among the Opioid Marketing

4    Enterprise Members, and between the Opioid Marketing Enterprise Members and front groups,

5    regarding the misrepresentations, marketing statements and claims about opioids, including the

6    non-addictive, safe use of chronic long-term pain generally;

7              c.        Written representations and telephone calls among the Opioid Marketing

8    Enterprise Members, and between the Opioid Marketing Enterprise Members and KOLs

9    regarding the misrepresentations, marketing statements and claims about opioids, including the

10   non-addictive, safe use of chronic long-term pain generally;

11             d.        E-mails, telephone and written communications among the Opioid

12   Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and the

13   front groups agreeing to or implementing the opioids marketing scheme;

14             e.        E-mails, telephone and written communications among the Opioid

15   Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and the

16   KOLs agreeing to or implementing the opioids marketing scheme;

17             f.        Communications among the Opioid Marketing Enterprise Members, and

18   between the Opioid Marketing Enterprise Members, front groups and the media regarding

19   publication, drafting of treatment guidelines, and the dissemination of the same as part of the

20   Opioid Marketing Enterprise;

21             g.        Communications among the Opioid Marketing Enterprise Members, and

22   between the Opioid Marketing Enterprise Members, KOLs and the media regarding publication,

23   drafting of treatment guidelines, and the dissemination of the same as part of the Opioid

24   Marketing Enterprise;

25             h.        Written and oral communications directed to DC 37 and/or members of its

26   service population and that fraudulently misrepresented the risks and benefits of using opioids for

27   chronic pain; and

28

i.     Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

91.     In addition to the above-referenced predicate acts, it was intended by and foreseeable to the Opioid Marketing Enterprise Members that the front groups and the KOLs would distribute publications through the U.S. Mail and by interstate wire facilities, and, in those publications, claim that the benefits of using opioids for chronic pain outweighed the risks of doing so.

92.     To achieve the common goal and purpose of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members and members of the Opioid Marketing Enterprise hid from the consumers, prescribers, regulators and DC 37: (a) the fraudulent nature of the Opioid Marketing Enterprise Members' marketing scheme; (b) the fraudulent nature of statements made by the Opioid Marketing Enterprise Members and by their KOLs, front groups and other third parties regarding the safety and efficacy of prescription opioids; and (c) the true nature of the relationship between the members of the Opioid Marketing Enterprise.

93.     The Opioid Marketing Enterprise Members, and each member of the Opioid Marketing Enterprise agreed, with knowledge and intent, to the overall objective of the Opioid Marketing Enterprise Members' fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in marketing prescription opioids.

94.     Indeed, for the Opioid Marketing Enterprise Members' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids.  This conclusion is supported by the fact that opioid manufacturers among the Opioid Marketing Enterprise Members financed, supported, and worked through the same KOLs and Front groups, and often collaborated on and mutually supported the same publications, continuing medical education, presentations, and prescription guidelines.

95.     The Opioid Marketing Enterprise Members' predicate acts all had the purpose of creating the opioid epidemic that substantially injured DC 37's business, while simultaneously generating billion-dollar revenue and profits for the Opioid Marketing Enterprise Members.  The predicate acts were committed or caused to be committed by the Opioid Marketing Enterprise

Members through their participation in the Opioid Marketing Enterprise and in furtherance of its fraudulent scheme.

## VIII.   CAUSES OF ACTION

### A.   Racketeer Influenced and Corrupt Organizations (RICO), 18 U.S.C. § 1961, et. seq.

96.   DC 37 incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein, and further alleges as follows:

97.   This claim is brought by DC 37 against Defendant McKinsey for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964, for violations of 18 U.S.C. § 1961, et seq.

98.   At all relevant times, McKinsey is and has been a "person" under 18 U.S.C. § 1961(3) because it is capable of holding, and does hold, "a legal or beneficial interest in property."

99.   DC 37 is a "person," as that term is defined in 18 U.S.C. § 1961(3), and has standing to sue as it was and is injured in its business and/or property as a result of Defendant's wrongful conduct described herein.

100.   The Opioid Marketing Enterprise conducted an association-in-fact enterprise, and/or participated in the conduct of an enterprise through a pattern of illegal activities (the predicate racketeering acts of mail and wire fraud) to carry-out the common purpose of the Opioid Marketing Enterprise, i.e., to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term chronic pain.  Through the racketeering activities of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members sought to further the common purpose of the enterprise through a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioid use.  In so doing, each of the Opioid Marketing Enterprise Members knowingly conducted and participated in the conduct of the Opioid Marketing Activities by engaging in mail and wire fraud in violation of 18 U.S.C. §§ 1962(c) and (d).

101.    The Opioid Marketing Enterprise is an association-in-fact enterprise that consists of the Opioid Marketing Enterprise Members.

102.    Each of the Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise by playing a distinct role in furthering the enterprise's common purpose of increasing profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and the risks and symptoms of addiction, in order to increase the market for prescription opioids by changing prescriber habits and public perceptions.

103.    Specifically, the Opioid Marketing Enterprise Members each worked together to coordinate the enterprise's goals and conceal their role, and the enterprise's existence, from the public by, among other things, (i) funding, editing and distributing publications that supported and advanced their false messages; (ii) funding KOLs to further promote their false messages; and (iii) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians.

104.    Further, each of the Opioid Marketing Enterprise Members had systematic links to and personal relationships with each other through joint participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities.  The systematic links and personal relationships that were formed and developed allowed members of the Opioid Marketing Enterprise the opportunity to form the common purpose and agree to conduct and participate in the conduct of the Opioid Marketing Enterprise.  Specifically, each of the Opioid Marketing Enterprise Members, including McKinsey working with and through the other Opioid Marketing Enterprise Members, coordinated their efforts through the same KOLs and front groups, based on their agreement and understanding that the front groups and KOLs were industry friendly and would work together with the Opioid Marketing Enterprise Members to advance the common purpose of the Opioid Marketing Enterprise; and each of the individuals and entities who formed the Opioid Marketing Enterprise acted to enable the common purpose and fraudulent scheme of the Opioid Marketing Enterprise.

105. At all relevant times, the Opioid Marketing Enterprise: (a) had an existence separate and distinct from each RICO Marketing Defendant and its members; (b) was separate and distinct from the pattern of racketeering in which the Opioid Marketing Enterprise Members engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the Opioid Marketing Enterprise Members; (d) was characterized by interpersonal relationships between and among each member of the Opioid Marketing Enterprise; and (e) had sufficient longevity for the enterprise to pursue its purpose and functioned as a continuing unit.

106. The Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), to increase profits and revenue by changing prescriber habits and public perceptions in order to increase the prescription and use of prescription opioids, and expand the market for opioids.

107. The Opioid Marketing Enterprise Members each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the Opioid Marketing Enterprise Members committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the Opioid Marketing Enterprise Members' regular use of the facilities, services, distribution channels, and employees of the Opioid Marketing Enterprise, the U.S. Mail and interstate wire facilities. The Opioid Marketing Enterprise Members participated in the scheme to defraud by using mail, telephones and the Internet to transmit mailings and wires in interstate or foreign commerce.

108. The Opioid Marketing Enterprise Members' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

a. Mail Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

b. Wire Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

109. Indeed, as summarized herein, the Opioid Marketing Enterprise Members used the mail and wires to send or receive thousands of communications, publications, representations, statements, electronic transmissions and payments to carry-out the Opioid Marketing Enterprise's fraudulent scheme.

110. Because the Opioid Marketing Enterprise Members disguised their participation in the enterprise, and worked to keep even the enterprise's existence secret so as to give the false appearance that their false messages reflected the views of independent third parties, many of the precise dates of the Opioid Marketing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the books and records maintained by the Opioid Marketing Enterprise Members, front groups, and KOLs.  Indeed, an essential part of the successful operation of the Opioid Marketing Enterprise alleged herein depended upon secrecy.  However, DC 37 has described the occasions on which the Opioid Marketing Enterprise Members disseminated misrepresentations and false statements to consumers, prescribers, regulators, and DC 37, and how those acts were in furtherance of the scheme.

111. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers, prescribers, regulators and DC 37.  The

Opioid Marketing Enterprise Members calculated and intentionally crafted the scheme and common purpose of the Opioid Marketing Enterprise to ensure their own profits remained high. In designing and implementing the scheme, the Opioid Marketing Enterprise Members understood and intended that those in the distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific evidence regarding the Opioid Marketing Enterprise Members' products.

112.    The Opioid Marketing Enterprise Members' pattern of racketeering activity alleged herein and the Opioid Marketing Enterprise are separate and distinct from each other. Likewise, the Opioid Marketing Enterprise Members are distinct from the Opioid Marketing Enterprise.

113.    The racketeering activities conducted by the Opioid Marketing Enterprise Members amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators and DC 37.  Each separate use of the U.S. Mail and/or interstate wire facilities employed by Defendant was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including consumers, prescribers, regulators and DC 37.  The Opioid Marketing Enterprise Members have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Opioid Marketing Enterprise.

114.    Each of the Opioid Marketing Enterprise Members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

115.    As described herein, the Opioid Marketing Enterprise Members engaged in a pattern of related and continuous predicate acts for years.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant money and revenue from the marketing and sale of their highly addictive and dangerous drugs.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

116.     The Opioid Marketing Enterprise Members' violations of law and their pattern of racketeering activity directly and proximately caused DC 37 injury in its business and property. The Opioid Marketing Enterprise Members' pattern of racketeering activity logically, substantially and foreseeably caused an opioid epidemic.  DC 37's injuries, as described below, were not unexpected, unforeseen or independent. Rather, as DC 37 alleges, the Opioid Marketing Enterprise Members knew that the opioids were unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse. Nevertheless, the Opioid Marketing Enterprise Members engaged in a scheme of deception that utilized the mail and wires in order to carry-out the Opioid Marketing Enterprises' fraudulent scheme, thereby increasing sales of their opioid products.

117.     It was foreseeable and expected that the Opioid Marketing Enterprise Members creating and then participating in the Opioid Marketing Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme would lead to a nationwide opioid epidemic, including increased opioid addiction and overdose.

118.     Defendant's misleading marketing and failure to prevent prescription opioid diversion damaged DC 37 and its authorizing tribes and villages.  Defendant's misconduct has contributed to a range of social problems, including violence and delinquency.  Adverse social outcomes include child neglect, family dysfunction, babies born addicted to opioids, criminal behavior, poverty, property damage, unemployment, and social despair.  As a result, more and more of DC 37's resources are devoted to addiction-related problems.

119.     Specifically, the Opioid Marketing Enterprise Members' creation of, and then participation in, the Opioid Marketing Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme has injured DC 37 in the form of substantial losses of money and property that logically, directly and foreseeably arise from the opioid-addiction epidemic. DC 37's injuries, as alleged throughout this Complaint, and expressly incorporated herein by reference, include:

1          a.      Costs for providing healthcare and medical care, additional therapeutic, and

2 prescription drug purchases, and other treatments for patients suffering from opioid-related

3 addiction or disease, including overdoses and deaths;

4          b.      Costs of training first responders in the proper treatment of drug overdoses;

5          c.      Costs associated with providing first responders with naloxone—an opioid

6 antagonist used to block the deadly effects of opioids in the context of overdose;

7          d.      Costs associated with emergency responses by first responders to opioid

8 overdoses;

9          e.      Costs for providing mental-health services, treatment, counseling,

10 rehabilitation services, and social services to victims of the opioid epidemic and their families;

11          f.      Costs for providing treatment of infants born with opioid-related medical

12 conditions, or born dependent on opioids due to drug use by mother during pregnancy;

13          g.      Costs associated with the injuries to the health and welfare of DC 37 and

14 its service population caused by the opioid epidemic;

15          h.      Costs associated with providing care for children whose parents suffer

16 from opioid-related disability or incapacitation;

17          i.      Losses caused by the diversion of healthcare funding to address the opioid

18 epidemic that would otherwise have been reinvested in DC 37's business.

19      120.    DC 37's injuries were directly and thus proximately caused by these racketeering

20 activities because they were the logical, substantial and foreseeable cause of DC 37's injuries.

21 But for the opioid-addiction epidemic the Opioid Marketing Enterprise Members created through

22 their Opioid Marketing Enterprise, DC 37 would not have lost money or property, and the health

23 and welfare of DC 37's service population would not have been injured.

24      121.    DC 37 is the most directly harmed entity, and there are no other plaintiffs better

25 suited to seek a remedy for the economic harms at issue here.

26      122.    DC 37 seeks all legal and equitable relief as allowed by law, including, inter alia,

27 actual damages; treble damages; equitable and/or injunctive relief in the form of court-supervised

28 corrective communication, actions and programs; forfeiture as deemed proper by the Court;

attorneys' fees; all costs and expenses of suit; and pre- and post-judgment interest, including, inter alia:

        a.      Actual damages and treble damages, including pre-suit and post-judgment interest;

        b.      An order enjoining any further violations of RICO;

        c.      An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;

        d.      An order enjoining the commission of any tortious conduct, as alleged in this Complaint;

        e.      An order enjoining any future marketing or misrepresentations regarding the health benefits or risks of prescription opioids use, except as specifically approved by the FDA;

        f.      An order enjoining any future marketing of opioids through non-branded marketing including through front groups, KOLs, websites, or in any other manner alleged in this Complaint that deviates from the manner or method in which such marketing has been approved by the FDA;

        g.      An order enjoining any future marketing to vulnerable populations, including but not limited to, persons over the age of fifty-five, anyone under the age of twenty-one, and veterans;

        h.      An order requiring McKinsey to publicly disclose all documents, communications, records, data, information, research or studies related to its work with Purdue and other manufacturers of opioids;

        i.      An order divesting McKinsey of any interest in, and the proceeds of any work related to opioids;

        j.      Forfeiture as deemed appropriate by the Court; and

        k.      Attorneys' fees and all costs and expenses of suit.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.   Fraud by Concealment

123.   DC 37 incorporates by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

124.   McKinsey is liable for both fraudulent concealment and non-disclosure. *See, e.g.*, Restatement (Second) of Torts §§ 550-51 (1977).

125.   Specifically, McKinsey committed fraud by acting to conceal and advising the concealment of the true dangers of opioids and Purdue's prior misconduct while working to increase sales of opioids through its consulting work for Purdue and others, and concealing all of this information from regulators and DC 37.

126.   A reasonable consumer would not have expected that the opioids promoted by McKinsey via its clients were unreasonably dangerous and addictive and that McKinsey's clients were failing to follow state and federal law, including the Controlled Substances Act.

127.   McKinsey knew that these facts about opioids would be important to health and welfare benefit plans like DC 37. McKinsey ensured that DC 37 did not discover this information through actively concealing it. McKinsey intended for DC 37 to rely on their omissions—which it did by indirectly purchasing, paying, and reimbursing for opioids intended for consumption by its members, retirees, and their families and for substance abuse treatment.

128.   McKinsey had a duty to disclose the true dangers of opioids. These important facts were known and/or accessible only to McKinsey, including due to its detailed involvement in its clients' sales and marketing strategies. McKinsey also knew the addictive and potentially harmful nature of opioids was not known to or reasonably discoverable by DC 37. If McKinsey had disclosed these material facts, DC 37 would have seen them.

129.   McKinsey also had a duty to disclose the true nature of opioids in light of its affirmative statements, by and through its clients, about opioids with respect to their safety and side effects, among other factors. In its clients' campaigns, McKinsey intentionally concealed, suppressed, and failed to disclose to DC 37 that opioids were unsafe and could result in life-threatening, and indeed life-ending, side effects.

130.    McKinsey knew these statements were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the nature of opioids. Because McKinsey, by and through its clients, volunteered to provide information about opioids that McKinsey's clients offered for sale indirectly to DC 37 and its members, retirees, and their families, McKinsey had the duty to disclose the whole truth. It did not.

131.    McKinsey did not fulfill its duties to disclose to DC 37. Instead, it actively concealed the truth, including during regulatory processes and throughout its clients' marketing and sale of opioids.

132.    McKinsey's deceptive actions harmed DC 37. Because McKinsey fraudulently concealed the truth about opioids' dangers, DC 37 suffered economic losses. Plaintiffs suffered damages including but not limited to indirect payments for opioids and for substance abuse treatment. Accordingly, McKinsey is liable to DC 37 for damages in an amount to be proven at trial.

133.    McKinsey's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of DC 37; and to enrich itself. Its misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

**C.     Unjust Enrichment**

134.    DC 37 incorporates by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

135.    As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, McKinsey has profited and benefited from the increase in the distribution and purchase of opioids within the communities served by DC 37, including from opioids foreseeably and deliberately diverted within and into those communities.

136.    DC 37 has expended substantial amounts of money to fix or mitigate the societal harms caused by McKinsey's conduct.

137.    DC 37 has conferred a benefit upon McKinsey by paying for what may be called McKinsey's externalities—the costs of the harm caused by McKinsey's negligent or otherwise unlawful distribution and sales practices.

138.    McKinsey is aware of this obvious benefit, and that retention of this benefit is unjust.

139.    DC 37 has paid for the cost of McKinsey's externalities and McKinsey has benefitted from those payments because they allowed McKinsey to continue providing customers with a high volume of opioid products.  Because of their deceptive marketing of prescription opioids, McKinsey obtained enrichment they would not otherwise have obtained.  Because of their conscious failure to exercise due diligence in preventing diversion, McKinsey obtained enrichment it would not otherwise have obtained.  The enrichment was without justification and DC 37 lacks a remedy provided by law.

140.    McKinsey made substantial profits while fueling the prescription drug epidemic in the communities served by DC 37.

141.    McKinsey has been unjustly enriched by its negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing.

142.    It would be inequitable to allow McKinsey to retain benefit or financial advantage.

143.    McKinsey's misconduct alleged in this case has caused ongoing and persistent harm to DC 37.

144.    DC 37 demands judgment against McKinsey for restitution, disgorgement, and any other relief allowed in law or equity.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff DC 37 prays that the Court:

A.    Grant class certification at an early practicable time to the Class described herein, and to any appropriate subclasses, under Rule 23(a) and Rule 23 (b)(1),(2), (3), and Rule 24(c)(4), as applicable; appoint Plaintiff and its counsel to represent the class; appoint additional class or subclass representatives as appropriate; and maintain this action as a class action for purposes of notice, trial, and resolution;

1            B.     Enter judgment against McKinsey and in favor of DC 37 and the Class it

2    seeks to represent;

3            C.     Award compensatory damages in an amount sufficient to fairly and

4    completely compensate Plaintiff and the Class fairly and completely for all damages; treble

5    damages; pre-judgment and post-judgment interest as provided by law, and that such interest be

6    awarded at the highest legal rate;

7            D.     Enter orders and procedures to abate the nuisance created by McKinsey's

8    wrongful conduct;

9            E.     Enjoin McKinsey from continuing or repeating the wrongful conduct

10   alleged herein and from the publication and/or dissemination of false and misleading materials

11   directly or indirectly;

12           F.     Award DC 37 its costs of suit, including reasonable attorneys' fees as

13   provided by law;

14           G.     Award such further and additional relief as the Court may deem just and

15   proper under the circumstances; and

16           H.     Grant DC 37 the right to amend its pleadings to conform to the evidence

17   produced at trial.

18   **X.**     **JURY DEMAND**

19        DC 37 requests a trial by jury on all issues so triable.

20    Dated: August 13, 2021         */s/ Elizabeth J. Cabraser*

21                               Elizabeth J. Cabraser

22                               Elizabeth J. Cabraser (CA Bar No. 083151)
                                 ecabraser@lchb.com

23                               Eric B. Fastiff (CA Bar No. 182260)
                                 efastiff@lchb.com

24                               Bruce W. Leppla (CA Bar No. 071642)
                                 bleppla@lchb.com

25                               Lieff Cabraser Heimann & Bernstein, LLP
                                 275 Battery Street, 29th Floor

26                               San Francisco, Ca  94111-3339
                                 Telephone: (415) 956-1000

27                               Facsimile: (415) 956-1008

28

1
2
3
4

Mark P. Chalos
mchalos@lchb.com
Lieff Cabraser Heimann & Bernstein, LLP
222 2nd Ave. South, Suite 1640
Nashville, TN  37201
Telephone: (615) 313-9000
Facsimile: (615) 313-9965

5
6
7
8
9

Paulina do Amaral (CA Bar No. 196757)
pdoamaral@lchb.com
Catherine P. Humphreville
chumphreville@lchb.com
Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

10
11
12
13

Dan Drachler
ddrachler@lchb.com
Lieff Cabraser Heimann & Bernstein, LLP
1904 Third Avenue, Suite 1030
Seattle, WA  98101
Telephone: (206) 895-5005 ext. 2373
Facsimile: (206) 895-3131

14
15

*Attorneys for Plaintiff District Council 37 Benefits Fund Trust*

16
17
18
19
20
21
22
23
24
25
26
27
28